## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LORI SHEM-TOV, | |
| *Plaintiff*, | |
| v. | Civil Action No. 17-2452 (RDM) |
| DEPARTMENT OF JUSTICE, *et al.*, | |
| *Defendants.* | |

### MEMORANDUM OPINION AND ORDER

This case concerns how the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, applies to requests from foreign law enforcement authorities seeking the assistance of the United States in criminal investigations. Plaintiff Lori Shem-Tov is a defendant in a criminal prosecution in Israel, charged with allegedly publishing personal information about Israeli judicial and government officials and private individuals on the internet, using her blog entries to accuse these officials of sexually or physically abusing their own children and children under their care, and publishing personal information about their children, including their names, addresses, schools, medical and psychiatric treatment and other information, in violation of Israeli law. Dkt. 63 at 3–4 (citing Dkt. 63-4 at 1–24); Dkt. 63-1 at 1–2 (2d SUMF ¶¶ 1–5). To assist in her defense, Plaintiff submitted FOIA requests to Defendants the Criminal Division of the U.S. Department of Justice ("DOJ"), the U.S. Department of Homeland Security ("DHS"), and INTERPOL Washington, U.S. National Central Bureau ("USNCB"), seeking, among other things, records of these agencies' communications with the Israeli government "concerning the request of the Government of Israel pursuant to Article 7 of the Treaty on Mutual Legal Assistance in Criminal Matters related to data from WordPress.com web blogs,"

communications between DOJ, DHS, INTERPOL, and Automattic Inc. regarding various "web blogs," including http://lory-shemtov.com, and "[a]ll records . . . from the day of initial contact by the Government of Israel regarding Automattic Inc. web blogs."  Dkt. 1-4; *see also* Dkt. 1-5; Dkt. 1-6; Dkt. 1 at 2 (Compl. ¶ 7).  DHS and the USNCB previously moved for summary judgment, Dkt. 34, which the Court granted in part and denied in part, *Shem-Tov v. Dep't of Justice*, No. 17-cv-2452, 2020 WL 2735613, at *1 (D.D.C. May 25, 2020) ("*Shem-Tov I*").

The USNCB now renews its motion for summary judgment as to the one ground on which its last motion was denied—its withholding of certain responsive materials in whole or in part under FOIA Exemption 7(D).  *Id.* at *10–11; Dkt. 63.  The Court previously denied the USNCB's motion for summary judgment with respect to these withholdings, because the Court could not "discharge its obligation to assess the lawfulness of the withholding on [the] sparse briefing and evidence" provided by the agency.  *Shem-Tov I*, 2020 WL 2735613, at *11.  Because the USNCB's renewed motion is supported by the factual material and legal argument that was previously missing, the Court will now grant the agency's motion for summary judgment.

## I.  BACKGROUND

The Court has previously described the background of this case and will, accordingly, only briefly summarize the facts relevant to the pending motion.  Plaintiff was arrested in Israel in February 2017, *Shem-Tov I*, 2020 WL 2735613, at *1, and is now the defendant in a criminal prosecution in that country, Dkt. 63-1 at 1 (2d SUMF ¶ 1).  Although Plaintiff characterizes the case against her as based "on trumped-up charges" meant to silence her journalistic work after she "refuse[d] to change her position on governmental corruption," Dkt. 66 at 1, the USNCB asserts that, after losing custody of her children through a legal proceeding in 2009, Dkt. 63-1 at

1 (2d SUMF ¶ 2), "Plaintiff used 32 internet websites and six Facebook accounts to post and publish personal information about the judicial and government officials and private persons [involved], including their addresses, telephone numbers, personal email addresses, and photographs;" accused them "of sexually or physically abusing their own children or children under their care;" and "published personal and private information about the children, including their names, their home addresses, their schools, medical and psychiatric treatment, and other information that violated the privacy laws of Israel," *id.* at 2 (2d SUMF ¶¶ 3–5); *see also* Dkt. 63-4 at 4–16.

INTERPOL, the International Criminal Police Organization, exists to "'ensure and [to] promote the widest possible mutual assistance between all criminal police authorities . . . [in] member countries.'" *Shem-Tov I,* 2020 WL 2735613, at *2. The United States has designated the USNCB as its point of contact for INTERPOL. *Id.* Subsequent to her arrest, Plaintiff submitted a FOIA request to the Criminal Division of the Justice Department, DHS, and the USNCB, which "sought all records relating to a request by Israel, pursuant to [the Treaty on Mutual Legal Assistance in Criminal Matters ("MLAT")], for assistance in obtaining records relating to certain blogs." Dkt. 34 at 8 (1st SUMF ¶ 15); *see also Shem-Tov I,* 2020 WL 2735613, at *2. As relevant here, the USNCB "informed Plaintiff that it had at least 72 responsive pages and released 45 of those pages to her with some information redacted," pursuant to various FOIA exemptions. *Shem-Tov I*, 2020 WL 2735613, at *3. The USNCB, however, withheld several documents in full or in part "associated with an investigative assistance and MLAT request that originated from another country's National Central Bureau" ("NCB"). Dkt. 63-2 at 4 (2d Dembkowski Decl. ¶ 5) (internal quotation marks omitted). In so doing, the USNCB relied on FOIA Exemption 7(D), which protects:

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).[1]  In particular, the USNCB relied on Exemption 7(D) to withhold in full eleven "pages [that] originated with a foreign [NCB]," Dkt. 34-1 at 12 (SUMF ¶ 23), as well as portions of other pages, including one document that originated with DHS but concerned the foreign NCB's request.  *Id.* at 12–13 (1st SUMF ¶¶ 23–24); *id.* at 102–04 (*Vaughn* index); *Shem-Tov I*, 2020 WL 2735613, at *6, 12.  Because the USNCB made the redactions to this document before referring it to DHS for processing and production, *Shem-Tov I*, 2020 WL 2735613, at *12, the Court will treat it as one of the USNCB's records for purposes of this opinion.

Plaintiff, proceeding *pro se*, commenced this FOIA action against Defendants in November 2017, Dkt. 1 (Compl.), and moved for summary judgment on November 14, 2018, Dkt. 19.[2]  The USNCB and DHS cross-moved for summary judgment several months later.  Dkt. 34.[3]  The Court denied summary judgment to Plaintiff and granted summary judgment in part to

---

[1]  "Each INTERPOL member country designates a national law enforcement agency . . . as the member country's point of contact for all Interpol matters."  *Shem-Tov I*, 2020 WL 2735613, at *2 (internal quotation marks and citation omitted).  The USNCB and the foreign NCB, as designated contacts for INTERPOL, are both law enforcement agencies.

[2]  The Court denied this motion as premature but later treated Plaintiff's opposition to Defendants' first motion for summary judgment, Dkt. 41, as a cross-motion for summary judgment.  Minute Order (Aug. 9, 2019).

[3]  The Justice Department's Criminal Division is still processing Plaintiff's FOIA request and has not moved for summary judgment.  *See* Dkt. 70 (status report).

the USNCB and DHS, concluding that their searches were adequate and that many of their withholdings were proper. *Shem-Tov I*, 2020 WL 2735613, at *6–7, 9, 12. The Court denied the USNCB's motion for summary judgment as to withholdings made under Exemption 7(D), however. *Id.* at *11–12. In doing so, the Court noted several deficiencies in the USNCB's factual and legal showing: (1) the Court could not "discern . . . whether [the USNCB] contend[ed] that any record that relates in any way to a request for information or assistance from a foreign NCB is exempt from disclosure or whether [the USNCB] merely contend[ed] that the exemption applies to a subset of such records, and, if so, how that subset is defined in this case;" (2) "[t]he factual record . . . [said] nothing about whether the withheld information [was], in fact, 'confidential;'" (3) the USNCB said nothing about "whether a foreign NCB that is *seeking* information from the USNCB or from U.S. law enforcement agencies constitutes a confidential *source* that has 'furnished information;'" (4) the USNCB did not analyze case law relating to the application of Exemption 7(D) to INTERPOL; (5) the USNCB failed to explain whether it was relying "solely on an express assurance of confidentiality or also on an inferred assurance; and" (6) if "relying on an inferred assurance," the USNCB did not explain how the governing four-factor test was satisfied. *Id.* at *10. The Court, accordingly, denied summary judgment to the USNCB (and DHS, to the extent the claim against it turned in part on the USNCB's redactions) but did so without prejudice so that Defendants could "attempt to better justify the withholdings." *Id.* at *10–11.

In a status report filed in June 2020, DHS notified the Court that it would not renew its motion for summary judgment, "[b]ecause the issue regarding the application of Exemption 7(D) involves solely documents processed by Defendant USNCB." Dkt. 61 at 3. The USNCB, for its part, has now renewed its motion for summary judgment as to the 7(D) withholdings. Dkt. 63.

After the Court issued a *Fox/Neal* order, Dkt. 64, Plaintiff filed her opposition, Dkt. 66, and the USNCB replied, Dkt. 67. The matter is now ripe for decision.

## II. LEGAL STANDARD

Under FOIA, "when a plaintiff alleges that an agency has improperly withheld records, the reviewing court must 'determine the matter de novo.'" *Plunkett v. Dep't of Justice*, No. 11-cv-341, 2015 WL 5159489, at *4 (D.D.C. Sept. 1, 2015) (quoting 5 U.S.C. § 552(a)(4)(B)). "In making this determination, the Court must 'ascertain whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure,'" *id.* (quoting *Assassination Archives & Rsch. Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003)), a question that is "typically resolved on [a] motion[] for summary judgment under Federal Rule of Civil Procedure 56," *Borda v. Dep't of Justice, Crim. Div.*, 245 F. Supp. 3d 52, 57 (D.D.C. 2017); *see also Shapiro v. Dep't of Justice*, 153 F. Supp. 3d 253, 268 (D.D.C. 2016); *Plunkett*, 2015 WL 5159489, at *4.

"To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Borda*, 245 F. Supp. 3d at 57; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "An agency [typically] proves its entitlement to summary judgment through affidavits or declarations, including a *Vaughn* index, explaining its searches and withholdings." *Shem-Tov I*, 2020 WL 2735613, at *4. If the information in those materials is "'relatively detailed and non-conclusory and not controverted by either contrary evidence in the record nor by evidence of agency bad faith,'" then the agency is entitled to summary judgment. *Id.* (quoting *Coffey v. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1, 6 (D.D.C. 2017)).

### III.  ANALYSIS

**A.      Applicability of Exemption 7(D)**

"Exemption 7(D) protects two distinct types of information: (1) information [that] 'could reasonably be expected to disclose the identity of a confidential source[;]'[] and (2) 'information furnished by a confidential source'" in the context of a criminal or national security investigation.  *Cobar v. Dep't of Justice*, 81 F. Supp. 3d 64, 72 (D.D.C. 2015); *see also Parker v. Dep't of Justice*, 934 F.2d 375, 380 (D.C. Cir. 1991).  "A source counts as confidential 'if the source provided information under an express assurance of confidentiality or in circumstances from which such an assurance could reasonably be inferred.'"  *Labow v. U.S. Dep't of Justice*, 831 F.3d 523, 530 (D.C. Cir. 2016) (quoting *Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995)).  "To withhold information under Exemption 7(D) by express assurances of confidentiality, the [agency] must present 'probative evidence that the source did in fact receive an express grant of confidentiality.'"  *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 34 (D.C. Cir. 1998) (quoting *Davin v. U.S. Dep't of Justice*, 60 F.3d 1043, 1061 (3d Cir. 1995)).  "Such evidence can take a wide variety of forms, including notations on the face of a withheld document, the personal knowledge of an official familiar with the source, a statement by the source, or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources."  *Id.*  When an agency asserts that a source provided information under an implied assurance of confidentiality, the Court must consider that contention in light of four factors: "the character of the crime at issue, the source's relation to the crime, whether the source received payment, and whether the source has an ongoing relationship with the law enforcement agency and typically communicates with the agency only at locations and under conditions which assure the contact will not be noticed."  *Shem-Tov I*, 2020 WL

2735613, at *10 (quoting *Labow*, 831 F.3d at 531); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 179 (1993).

In its renewed motion for summary judgment, the USNCB addresses the factual and legal gaps left in its prior motion. As explained in the declaration of Daniel P. Dembkowski, a USNCB Government Information Specialist, Dkt. 63-2 at 1–2 (2d Dembkowski Decl. ¶¶ 1–2), the agency is withholding the records (or portions of records) at issue under Exemption 7(D) "to protect the disclosure of name(s), identifying information about, and information provided to the USNCB and then, in this case, to [DHS] by a confidential source, namely from another member of INTERPOL and its request for assistance via its NCB," *id.* at 4 (2d Dembkowski Decl. ¶¶ 5–6). Dembkowski summarizes the disputed withholdings as follows:

> [D]ocument numbers 1 through 11 are documents that originated from a foreign NCB that requested the assistance of the USNCB and U.S. law enforcement authorities concerning the activities of individuals who were being investigated by foreign law enforcement agencies for crimes relating to publicizing victims' personal information on Internet websites, extortion, and threats, and specifically to help them preserve information contained on websites and servers based in the United States, while their Ministry of Justice prepared a formal Mutual Legal Assistance request. The eleven pages include the NCB's initial and follow-up communication requests along with other investigative materials such as lists of internet domains and email addresses related to their criminal investigation. The remaining documents referenced in the Vaughn index containing [E]xemption 7(D) withholdings[] are messages from the foreign NCB requesting assistance from the USNCB concerning the status of their preservation requests.

*Id.* at 3 (2d Dembkowski Decl. ¶ 4). The information withheld, according to Dembkowski, "is in fact confidential and has not been previously released by the foreign NCB, the USNCB, or other U.S. authorities." *Id.* at 5 (2d Dembkowski Decl. ¶ 7). Reinforcing this contention, on June 17, 2020, the USNCB contacted the originating country, seeking authorization to disclose the contested documents, and that country refused to authorize disclosure. Dkt. 63-1 at 7 (SUMF ¶ 18); Dkt. 63-2 at 14 (2d Dembkowski Decl. ¶ 17).

To justify its withholdings, the USNCB invokes both types of protection afforded by Exemption 7(D).  First, the USNCB seeks to protect the identity of the foreign NCB under Exemption 7(D)'s first clause, *id.* at 5 (2d Dembkowski Decl. ¶ 6), which protects records or information that "could reasonably be expected to disclose the identity of a confidential source," 5 U.S.C. § 552(b)(7)(D).  Second, it seeks to protect "the NCB's request for assistance to U.S. law enforcement, including the information and documents concerning the nature and items of interest in its criminal investigation [that] the NCB provided to the USNCB" under Exemption 7(D)'s second clause, Dkt. 63-2 at 5 (2d Dembkowski Decl. ¶ 6), which protects "information furnished by a confidential source," 5 U.S.C. § 552(b)(7)(D).

Before turning to the specific showing required under Exemption 7(D), the Court must determine whether the records at issue were "compiled for law enforcement purposes," a requirement that applies to all "six categories of documents" subject to Exemption 7.  *Campbell*, 164 F.3d at 31.  Although the Court already held in She*m-Tov I* that this threshold requirement is satisfied here, 2020 WL 2735613, at *8, and, indeed, is not disputed by Plaintiff, a more detailed explanation for that conclusion may help elucidate the previously unanswered questions identified in the Court's prior opinion and addressed in more detail below.  Were the records at issue compiled for the purpose of enforcing federal law, the threshold requirement would be easily met.  Here, however, the records were received from a foreign state (or included communications with the foreign state) for the purpose of assisting that state in its own investigation and prosecution arising from alleged violations of the foreign state's criminal law. Dkt. 63-2 at 3–4 (2d Dembkowski Decl. ¶ 4).  The first question, then, is whether the phrase "for law enforcement purposes," as used in Exemption 7, includes the enforcement of the criminal law of a foreign state.

The D.C. Circuit answered that question in *Bevis v. Dep't of State*, 801 F.2d 1386 (D.C. Cir. 1986).  In that case, the plaintiffs sought the release "of materials in the [FBI's] files relating primarily to the 1981 murder in El Salvador of two Americans working for the American Institute for Free Labor Development."  *Id.* at 1387.  As the D.C. Circuit explained, "there [was] no question that [these] investigatory records . . . were compiled for the purpose of aiding *Salvadoran* law enforcement;" the FBI investigation "was initiated at the specific request of El Salvador for assistance in the arrest and extradition of a suspect located in the United States, and requests for additional assistance with respect to later murders were made through the State Department."  *Id.* at 1388.  Rejecting the government's contention that Exemption 7 "embraces only *domestic* law enforcement purposes," the D.C. Circuit wrote:

> The language of the statute makes no distinction between foreign and domestic enforcement purposes.  Read literally, the statutory language supports the district court's holding that the exemption applies to each.  This reading of [Exemption 7] is also supported by the logic of the statute.  This court has held that "[w]here, for a federally authorized purpose, a federal criminal investigatory agency has opened an inquiry into a crime perpetrated under the law of another jurisdiction, there seems to us no reason why confidential information would be considered any less deserving of protection."  *Shaw v. FBI*, 749 F.2d 58, 64 (D.C. Cir. 1984).
>
> Although *Shaw* dealt with the application of [Exemption 7] to state enforcement proceedings, its reasoning is equally applicable to the Salvadoran enforcement proceedings here at issue.  The FBI's inquiry into the Salvadoran cases was "for a federally authorized purpose," *i.e.*, pursuant to 18 U.S.C. § 3184 (1982) (establishing extradition procedures), and 28 U.S.C. § 533(3) (1982) (authorizing FBI cooperation with foreign law enforcement agencies at the request of the State Department).  Thus, as in *Shaw*, there is "no reason why confidential information would be considered any less deserving of protection."

*Id.* (emphasis in original).

So too here.  "The United States' membership and participation in INTERPOL is governed by . . . [22 U.S.C. § 263a] and the USNCB's functions and duties are specified in . . . [28 C.F.R. § 0.34]."  Dkt. 34-1 at 4 (1st Dembkowski Decl. ¶ 9).  Among other things, the

USNCB's governing regulations authorize the bureau to "[t]ransmit information of a criminal justice . . . or other law enforcement related nature between National Central Bureaus of INTERPOL member countries, and law enforcement agencies within the United States and abroad" and to "respond to requests by law enforcement agencies . . . when in agreement with the INTERPOL constitution."  28 C.F.R. § 0.34(d).  This activity, moreover, promotes the interest of both foreign and U.S. law enforcement efforts by providing for reciprocal assistance.  *See id*. § 0.34(a) (instructing the USNCB to "[f]acilitate international law enforcement cooperation"); Dkt. 63-2 at 7 (2d Dembkowski Decl. ¶ 9) (explaining that "[o]ne of the USNCB's most important functions," in furtherance of this goal of cooperation, "is to respond to inquiries from foreign law enforcement agencies").  Thus, the fact that the information at issue here was provided to the USNCB by a foreign NCB to assist *a foreign law enforcement investigation* does not undermine the conclusion that the information was "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7).  The USNCB needed information from the foreign NCB "for the purpose" of guiding and coordinating the U.S. efforts to obtain the requested information for the foreign NCB.  That was a "law enforcement" purpose, and nothing more is necessary to satisfy the threshold requirement of Exemption 7.

Turning to the specific requirements of Exemption 7(D), the Court must still consider whether the foreign NCB constitutes a "source."  Although the Court directed the USNCB to address this question in *Shem-Tov I*, 2020 WL 2735613, at *10, the government's brief says nothing about the question, and the Dembkowski declaration merely includes a citation to a case from this district that touches on the question, Dkt. 63-2 at 4–5 (2d Dembkowski Decl. ¶ 6) (citing *Billington v. Dep't of Justice*, 69 F. Supp. 2d 128 (D.D.C. 1999), *rev'd in part on other grounds*, 233 F.3d 581 (D.C. Cir. 2000)).  Nonetheless, because materials collected to aid foreign

law enforcement efforts are records "compiled for law enforcement purposes," the Court sees no reason that foreign NCBs seeking aid with their own criminal investigations would not qualify as "sources" within the meaning of Exemption 7(D).

To be sure, at first blush one might question whether a foreign state that seeks information from the United States constitutes a source. But this case—and the details offered in the second Dembkowski declaration—demonstrate that, in *seeking* assistance, an entity can also qualify as a *source*, because the request for assistance itself conveys confidential information that the responding entity needs to provide the requested assistance. The first and second Dembkowski declarations and the *Vaughn* index explain that all of the withheld information was either provided by the foreign NCB to the USNCB (and subsequently to DHS) or disclosed the identity of the foreign NCB or the substance of the assistance that the foreign NCB sought. Dkt. 34-1 at 12–13 (1st Dembkowski Decl. ¶¶ 23–24); Dkt. 63-2 at 2–3 (2d Dembkowski Decl. ¶ 4); *see, e.g.*, 34-1 at 83–93, 102–07, 109–16 (*Vaughn* index). The withheld information includes the "website domains and email address" that the foreign NCB identified to the USNCB as "of value to their investigation." Dkt. 63-2 at 5 (2d Dembkowski Decl. ¶ 7). All eleven documents withheld in full "originated from a foreign [NCB]" and included identifying information, information relating to the "criminal investigation" or sought "an update concerning their previous message regarding their . . . investigative assistance and MLAT request." Dkt. 34-1 at 83–91 (*Vaughn* index); *see also* Dkt. 63-2 at 3 (2d Dembkowski Decl. ¶ 4). Although the documents withheld in part pursuant to Exemption 7(D) did not directly originate from the foreign NCB, they included the same type of information and, at times, merely forwarded material provided directly by the foreign NCB. *See* Dkt. 34-1 at 37–81; *see, e.g.*, *id.* at 91–93, 102–04, 117–27 (*Vaughn* index). In short, the foreign NCB was, in fact, the "source" of the

12

information at issue, and that information was provided to the USNCB and DHS for a "law enforcement purpose"—namely, to inform the U.S. law enforcement authorities about the nature and focus of the foreign state's investigation, so they could assist the foreign authorities in that investigation.

Defendants point to this Court's decision in *Billington v. Dep't of Justice*, 69 F. Supp. 2d 128, to support the premise that a foreign law enforcement agency can qualify as a confidential source, even when that agency is *requesting* information for its own criminal investigation, rather than *providing* information.  In reaching that conclusion, the *Billington* court reasoned that disclosure of the request from the foreign state would reveal that the foreign state also provides reciprocal assistance to the United States—that is, it would show that the foreign state is not only the recipient of U.S. assistance, but also that it is a confidential source of information provided to the United States.  Dkt. 63-2 at 4–5 (2d Dembkowski Decl. ¶ 6); *Billington*, 69 F. Supp. 2d at 138.[4]  Although that theory might sustain the USNCB's assertion of Exemption 7(D) in this case as well, the Court need not reach that question because, here, the USNCB credibly avers that the foreign NCB provided confidential information to the United States and that it is this foreign-sourced information that is currently at issue.

Under either approach, treating the foreign NCB as a source not only tracks the plain language of Exemption 7(D) but also furthers the goal of Exemption 7(D) by permitting federal law enforcement authorities to assure their domestic (and foreign) counterparts that they can share law-enforcement-sensitive information without fear of disclosure.  *Lesar v. Dep't of*

---

[4]  On appeal, the D.C. Circuit reversed other aspects of the district court's decision but agreed that the government's "declarations adequately document[ed] the giving of express assurances of confidentiality to the relevant foreign agencies," without questioning whether the foreign agencies were "sources" within the meaning of Exemption 7(D).  233 F.3d 581, 585 n.5.

*Justice*, 636 F.2d 472, 491 (D.C. Cir. 1980) ("If the enforcement authority could not assure that information furnished by entities such as state and local law enforcement agencies would remain confidential, it would be confronted with the possibility of losing these valuable sources of information and, as a consequence, the federal agency's investigatory operations would be affected adversely.").  The proposition, moreover, runs both ways.  The United States has an interest in protecting its confidential sources, and, to foster reciprocal support, the United States has an interest in permitting other law enforcement authorities to seek federal assistance without the risk of disclosing confidential, law enforcement information.  The Court, accordingly, concludes that the foreign NCB constitutes a "source" for the purposes of Exemption 7(D).

Finally, the Court must determine whether the foreign NCB is not only a source, but a confidential one.  The USNCB devotes the bulk of its renewed motion for summary judgment to this question, arguing that the foreign NCB's request was subject both to an express assurance and an implicit assurance of confidentiality.  Dkt. 63 at 9–12.  As noted above, evidence of an express promise of confidentiality "can take a wide variety of forms, including . . . contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources."  *Campbell*, 164 F.3d at 34.  According to the second Dembkowski declaration, "[t]he expectation of confidentiality in the exchange of . . . law enforcement information about criminal activity between [INTERPOL] member countries has been explicitly documented by the General Assembly, the governing body of INTERPOL, in resolutions adopted in 1974 and 1988."  Dkt. 63-2 at 8 (2d Dembkowski Decl. ¶ 11).  The 1974 resolution "'urges that in the exchange of information, the . . . INTERPOL NCBs . . . strictly confine the availability of information to official law enforcement and criminal justice agencies.'"  *Id.* at 8 (2d Dembkowski Decl. ¶ 12) (quoting the 1974 Resolution, 43/RES/BCN/1).  And, the 1988

14

resolution "urges NCBs . . . to protect the confidential nature of any documents, information and other items relating to criminal matters that they receive from other NCBs" and "to take all necessary steps to ensure that such documents, information and items are used solely for crime investigation and criminal proceedings." *Id.* (quoting the 1988 Resolution, AGN/57/Res/20).

Beyond these general exhortations, INTERPOL has published "Rules on the Processing of Data" ("RPD") "governing the use of, and access to all data processed in the INTERPOL Information System, including the documents in question in this matter." *Id.* at 9–10 (2d Dembkowski Decl. ¶¶ 13–14). As relevant here, the INTERPOL RPD (1) assigns responsibility to the NCBs and "'national entities and international entities'" to "'attribute[e] levels of confidentiality to the data they enter in the INTERPOL Information System and for observing the confidentiality of the data they consult, transmit or use for external processing purposes,'" *id.* at 10 (2d Dembkowski Decl. ¶ 15) (quoting RPD Art. 14); Dkt. 63-3 at 17; (2) establishes the "'conditions'" that must be met before "'[d]ata processed in the INTERPOL Information System'" are "'disclosed to the public,'" including advance authorization from "'[t]he source of the data,'" Dkt. 63-2 at 11 (2d Dembkowski Decl. ¶ 15) (quoting RPD Art. 61); Dkt. 63-3 at 32–33; (3) requires the recipient of the data to gain permission from the originating NCB before using the data even "'for administrative purposes,'" Dkt. 63-2 at 12 (2d Dembkowski Decl. ¶ 15) (quoting RPD Art. 65); Dkt. 63-3 at 34; and (4) sets three confidentiality levels by which data must be classified, Dkt. 63-2 at 12 (2d Dembkowski Decl. ¶ 15) (citing RPD Art. 112); Dkt. 63-3 at 47.

According to the second Dembkowski declaration, "the records in question" in the pending motion "are messages and information transmitted by another NCB to the USNCB via the INTERPOL Information System and are considered to be classified as 'INTERPOL FOR

OFFICIAL USE ONLY.'"  Dkt. 63-2 at 13 (2d Dembkowski Decl. ¶ 16).  Information is classified at that level "if . . . unauthorized disclosure is likely to adversely affect law-enforcement action or to disadvantage or discredit the Organization, its staff, its Members, National Central Bureaus, national entities, and international entities or persons concerned by the data."  *Id.* at 12 (2d Dembkowski Decl. ¶ 15).  Significantly, disclosure of this information requires authorization from the source.  *Id.* at 11 (2d Dembkowski Decl. ¶ 15).  Moreover, because a FOIA request constitutes a public disclosure for a non-law enforcement, administrative purpose under INTERPOL's rules, the USNCB is also expected to comply with the RPD provisions governing such disclosures, and those provisions require authorization from the originating NCB.  *Id.* at 13–14 (2d Dembkowski Decl. ¶ 17).  Here, when the USNCB sought authorization from the foreign NCB to disclose the records at issue in this motion, the "NCB declined to authorize [the] disclosure[,] citing the confidentiality of the documents and their law enforcement purpose."  *Id.* at 14 (2d Dembkowski Decl. ¶ 17).

Although nothing in these general conditions and agreements relieves the USNCB of its "obligation to specify precisely what material it is withholding pursuant to Exemption 7(D)," *Linn v. Dep't of Justice*, No. 92-cv-1406, 1995 WL 417810, at *22 (D.D.C. June 6, 1995), the USNCB has done far more than that here.  It has described communications that lie at the core of what INTERPOL's RPD—and, for that matter, Exemption 7(D)—aim to protect, that is, the sharing of information sought and shared in the pursuit of a criminal investigation.  Given the focus of the RPD, which amounts to "contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources," *Campbell*, 164 F.3d at 34, and the nature of the information at issue, the Court is persuaded that the foreign NCB shared the information with the USNCB with the express understanding that it would remain confidential,

absent prior authorization from the foreign NCB.  The foreign NCB's recent refusal to authorize

disclosure is consistent with that understanding.  Dkt. 63-2 at 14 (2d Dembkowski Decl. ¶ 17).

Plaintiff's only answer to this argument is to point to the unredacted portion of one of the

records at issue, which suggests that a private entity might eventually disclose some of the

information purportedly in dispute.  Dkt. 66 at 2–3.  That documents asserts:

> As previously indicated, the US Immigration & Customs Enforcement,
> Homeland Security Investigations, CyberSmuggling Center was contacted and
> requested to assist.  On January 19, 2016 [redacted].
>
> Please understand these requests are in effect for 90 (ninety) days.
> [WordPress.com][5] will keep the request confidential (not tell the subscribers)
> for a 45-day period.  After that, the account holders will be notified unless your
> MLAT provides for court-ordered non-disclosure provisions.

Dkt. 34-1 at 52.  As Plaintiff sees it, this communication made clear to the foreign NCB that its

request would not be kept confidential.  Dkt. 66 at 2–3.  The Court is not persuaded.  To start,

even if there is some overlap between the confidential information provided by the foreign NCB

and the DHS request to WordPress.com—and the Court expresses no view on that question—the

information at issue in this motion is distinct from whatever information WordPress.com might

disclose.  And beyond that, the INTERPOL confidentiality rules apply to INTERPOL members,

and not to private entities.  Although INTERPOL members may have an obligation to make

efforts to prevent disclosures by third-parties, *see* Dkt. 63-3 at 32, any lack of success in those

efforts does not undercut each NCB's separate undertaking not to disclose confidential

information without the prior authorization from the source.

The Court, therefore, concludes that the USNCB has carried its burden of demonstrating

that the foreign NCB is a confidential source, within the meaning of Exemption 7(D).  Because

---

[5]  The letter refers to "World Press," but the Court assumes the intended reference is to
WordPress.com.  In any event, the entity referenced does not change the Court's analysis.

the Court is persuaded that the foreign NCB acted under an express assurance of confidentiality, the Court need not reach the USNCB's separate contention that an assurance of confidentiality can be inferred from the circumstances.  Finally, because the NCB shared information in the context of a criminal investigation, Exemption 7(D) shields any confidential information, irrespective of whether the disclosure might also reveal the identity of the confidential source. *Shaw*, 749 F.2d at 61–62; *Lesar*, 636 F.2d at 492; *Cobar*, 81 F. Supp. 3d at 72.

## B.    Waiver

Separate from her arguments against the applicability of Exemption 7(D), Plaintiff maintains that public disclosure of much of the material at issue has effectively waived any protection that Exemption 7(D) might otherwise afford.  Dkt. 66 at 3–6.  This argument also fails.

The leading case addressing this issue is then-Judge Breyer's decision for the First Circuit in *Irons v. FBI*, 880 F.2d 1446 (1st Cir. 1989).  In that case, the plaintiff sought records from the FBI relating to "what certain FBI informants . . . had told the FBI" about "alleged Communist leaders in the 1950s." *Id.* at 1446.  Although the informants had testified at trial about their communications with the FBI, the FBI nonetheless refused to release the files, relying on Exemption 7(D), and the en banc First Circuit sustained the FBI's position.  *Id.*  The court concluded that "the concept of 'waiver' [did] not apply" for several reasons. *Id.* at 1449.  *First*, the plain language of Exemption 7(D) supported the FBI's position, and the text says nothing "at all about 'waiver.'" *Id*.  "*Second*, the fairly elaborate legislative history of exemption 7(D) suggests that Congress intended a literal interpretation, even where a literal application sweeps broadly," and "[t]hat history makes clear that Congress enacted the exemption in major part to help law enforcement agencies to recruit, and to maintain, confidential sources" and, in

particular, "to protect the flow of information to the law enforcement agency." *Id. Third,* those circuits that had addressed the issue had held that the "exemption . . . appl[ies] irrespective of subsequent public identification of the source . . . and irrespective of subsequent public release of portions of the information provided by the source." *Id.* at 1452 (emphasis omitted). *Fourth*, although some Exemption 7(D) cases had used "the word 'waiver' in the context of saying that a person was not a 'confidential source,'" "[t]hose cases do not support the proposition that courts may declare a 'waiver,' over an agency's objection, of the protections the statute gives to information that was furnished by a confidential source." *Id.* at 1455. *Fifth*, "judicial effort[s] to create a 'waiver' exception to exemption 7(D)'s language [would] run[] afoul of the statute's 'intent to provide workable rules.'" *Id.* (internal quotation marks omitted) (quoting *FTC v. Grolier, Inc.*, 462 U.S. 19, 27 (1983)).

The D.C. Circuit embraced *Irons* and its rule in *Parker v. Dep't of Justice*, 934 F.2d 375. There, the plaintiff argued "that even if FBI informants provided information confidentially, the informants waived the confidential status of their identities and the information to the extent that they testified at . . . trial." *Id.* at 379. The D.C. Circuit disagreed, observing that "[t]he First Circuit decision in *Irons* . . . fully presents the arguments of both [the plaintiff] and the FBI," and that "the First Circuit's analysis of the waiver issue [is] both persuasive and consistent with the interpretation of [the D.C. Circuit] and the other circuits." *Id.* at 379–80. The D.C. Circuit, accordingly, rejected the plaintiff's "claim that the FBI waived its Exemption 7(D) protection." *Id.* at 381; *see also Cobar*, 81 F. Supp. 3d at 73 (quoting *Reiter v. Drug Enf't Admin.*, No. 96-cv-378, 1997 WL 470108, at *6 (D.D.C. Aug. 13, 1997), *aff'd*, No. 97-5246, 1998 WL 202247 (D.C. Cir. 1998)).

As both *Irons* and *Parker* explain, with limited exceptions not applicable here,[6] the concept of waiver does not apply to withholdings made pursuant to Exemption 7(D).  Plaintiff points to several alleged public disclosures of at least some of the information at issue, *see* Dkt. 66 at 3–6, 7; Dkt. 66-2; Dkt. 66-3; Dkt. 63-4; Dkt. 66-5 at 3–4, 6–7 (Weisskopf Decl. ¶¶ 14–15, 26–29); Dkt. 34-1 at 26, but even if these sources disclosed some or all of the information at issue or the identity of the foreign NCB, they would not waive the protection afforded to the confidential information and source by Exemption 7(D).  And, likewise, none of these alleged disclosures cast doubt on the Court's conclusion that the communications at issue were, in fact, subject to an express commitment of confidentiality.

The Court, accordingly, rejects Plaintiff's waiver argument.

## C.    Segregability and Remaining Arguments

As the Court noted in *Shem-Tov I*, "with regard to any document an agency believes falls under a FOIA exception, the agency must separate[] the exempt from the non-exempt portions of

---

[6]  Confidentiality pursuant to Exemption 7(D) might not apply, for example, if a source unambiguously waives the right to confidentiality through testifying at trial, thereby becoming a "known" source, *see Parker*, 934 F.2d at 381 (emphasis omitted) (acknowledging two district court cases involving this scenario), or if a source writes a memoir about being a confidential source, *Blanton v. U.S. Dep't of Justice*, 63 F. Supp. 2d 35, 48–49 (D.D.C. 1999).  And even in such exceptional cases, the D.C. Circuit has suggested that underlying information furnished by the source remains protected.  *Parker*, 934 F.2d at 381.  Here, however, Plaintiff has not met her heavy burden of showing an unambiguous waiver by the foreign NCB of either its identity as the requesting agency or the substance of its communications.  *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007); *Cobar*, 81 F. Supp. 3d at 72.  To the contrary, the USNCB reports that the foreign NCB has recently reaffirmed its expectation of confidentiality, and nothing Plaintiff has submitted to the Court shows that the foreign NCB has ever expressly or implicitly authorized the United States to make public *anything* about the government-to-government communications at issue.  Indeed, one reason that the caselaw requires an *unambiguous* waiver *by the confidential source itself* is to avoid precisely the type of speculation that Plaintiff employs about whether news articles and other public sources might—or might not—already reveal the confidential material at issue.  As a result, the United States remains bound by its agreement to accord the communications confidential treatment.

the document, and produce[] the relevant non-exempt information."  2020 WL 2735613, at *11

(internal quotations omitted and alterations in original).  "The Court must, in turn, 'make specific

findings of segregability.'"  *Id.* (quoting *Stolt-Nielsen Transp. Grp., Ltd. v. United States*, 534

F.3d 728, 734 (D.C. Cir. 2008)).  In the case of Exemption 7(D)'s protection for information

furnished by a confidential source in the course of a criminal investigation, this analysis is more

straightforward than typical: the Exemption protects "*all* information obtained from" such

sources.  Dkt. 63-2 at 5 (2d Dembkowski Decl. ¶ 6); *Lesar*, 636 F.2d at 492.  Accordingly, the

USNCB's withholding of the 11 documents that originated from the foreign NCB requires no

segregation.  Similarly, all of the material redacted on Exemption 7(D) grounds from the

remaining records at issue either originated from the foreign NCB or revealed the identity of that

source or the substance of its communications.  To the extent those records were amenable to

segregation, the USNCB has released the segregated material.  Dkt. 63-2 at 3–4 (2d

Dembkowski Decl. ¶¶ 4–6).

Before concluding, the Court pauses to acknowledge one final contention.  The

declaration by Richard Weisskopf, to whom Plaintiff gave power-of-attorney to submit her FOIA

requests, *Shem-Tov I*, 2020 WL 2735613, at *2, seems to aver that Plaintiff did not have

adequate notice of, or access to, underlying materials associated with the Department's motion

for summary judgment previously before the Court.  *See* Dkt. 66-5 at 10–12 (Weisskopf Decl.

¶¶ 49–59).  The Court need not pause long over this contention.  First, Plaintiff does not advance

this argument in her brief, nor has she moved for reconsideration of the Court's prior decision.

Second, there is no dispute that Defendants' counsel "mailed a hard-copy of his filings directly to

Plaintiff Lori Shem-Tov by first class mail to the address listed with this Court," thus effecting

proper service under "Federal Rule of Civil Procedure 5(b)(2)(C)," as well as Local Civil Rules

5.3 and 5.4(d) .  Dkt. 67 at 8.  Third, Weisskopf had repeated notice of the existence of the allegedly missing exhibits, yet neither he nor Shem-Tov ever contacted opposing counsel to request them.  As Weisskopf acknowledges, his first notice came in the form of an email from prior counsel for Defendants in this case, in which the attorney attached the motion for summary judgment and accompanying exhibits and declarations but noted that Exhibit A would, "due to its size, be sent in another email."  Dkt. 66-5 at 10–11 (2d Dembkowski Decl. ¶ 50); *id.* at 14 (email from Fred Haynes to Weisskopf).  Almost a year passed from the time Weisskopf received that email to the day the Court issued its decision, yet Weisskopf gives no indication that he or Plaintiff ever followed up with Defendants' counsel about the allegedly missing exhibit.  As the USNCB notes, that omission is striking, given that Defendants' motion for summary judgment referenced Exhibit A, which included Dembkowski's declaration and the *Vaughn* index, dozens of times, a fact which should have further put Plaintiff on notice to request the missing materials.  Dkt. 67 at 9.[7]

The Court, accordingly, rejects any intimation that it should reopen the matters decided in *Shem-Tov I.*

---

[7] Defendants explain that the attorney previously assigned to the case, Fred Haynes, "retired from [F]ederal service shortly after . . . Defendants' initial Motion for Summary Judgment," and his replacement "has been unable to locate or obtain Mr. Haynes'[s] emails for the relevant time-period."  Dkt. 67 at 7–8.

## CONCLUSION

For the foregoing reasons, Defendant USNCB's motion for summary judgment, Dkt. 63, is hereby **GRANTED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: March 31, 2021